# Exhibit A

**Greg Myers**

| | |
|---|---|
| **From:** | VerStandig, Mac <mverstandig@offitkurman.com> |
| **Sent:** | Thursday, May 16, 2013 3:59 PM |
| **To:** | Greg Myers |
| **Cc:** | Erskine, William; Lynch, Timothy; King, Lisa |
| **Subject:** | Re: Montgomery County Land Development Project |

Greg,

Tomorrow is not going to work for scheduling reasons, but we would be delighted to meet at 2:00 Monday if you could come to Maple Lawn then.

In the interim, I have given Bill the broadest of outlines of what you are contemplating, but he would appreciate it if you could send an email with a factual sketch - and any supporting docs (ie, old ordinances) - before the meeting.

Vis a vis charge, please bring with you a check for $1,500.00 to cover the meeting.

Thanks,

Maurice "Mac" VerStandig
Offit | Kurman
      Attorneys At Law

4800 Montgomery Lane
Suite 900
Bethesda, Maryland 20814

(240) 507-1714

mailto:mverstandig@offitkurman.com
http://www.offitkurman.com
PRIVILEGED COMMUNICATION/PRIVACY NOTICE

Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.
IRS CIRCULAR 230 DISCLOSURE

To ensure compliance with requirements imposed by the IRS, we inform you that any US federal tax advice contained in this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed herein.

1

# Exhibit B

WASHINGTON | BALTIMORE | PHILADELPHIA | WILMINGTON | VIRGINIA


**Attorneys At Law**

Lisa T. Shattuck, *Client Relations Manager*
301.575.0364      **Phone**
301.575.0335      **Facsimile**
LShattuck@offitkurman.com

July 19, 2013

**VIA EMAIL ONLY:  brian@realestatedimensions.com**
6789 Goldsboro, LLC
c/o Real Estate Dimensions, LLC
Attn:  Brian King
3925 Beech Avenue
Baltimore, Maryland 21211

        Re:     <u>Engagement of Offit Kurman, P.A.; Confirmation of Fee Arrangement</u>

Dear Mr. King:

        The purpose of this letter is to confirm the terms of your engagement of Offit Kurman.  In this regard, our firm has agreed to represent you on the following terms and conditions:

        1.     Fees for services will generally be invoiced based upon the actual time spent on your account by attorneys in our office at the firm's standard hourly rates.  The rate schedule attached to this letter lists the billing rates of each attorney, paralegal and law clerk in our firm.  In the event that our rates increase in the future, the increased rates shall automatically take effect.  Various portions of the representation may be delegated, as appropriate, to other firm lawyers, paralegal and law clerk personnel.

        2.     On occasion, there may be circumstances where billing based upon our firm's standard hourly rates is not appropriate.  In such circumstances, we will advise you that standard hourly billing is not appropriate and we will bill you for services on an alternative basis.

        3.     Any and all activities conducted by the professional members of our staff, including, but not limited to, the making and receipt of telephone calls, drafting and review of correspondence and email, preparation and review of papers, agreements and memorandum, fact investigation, reading and analyzing written materials, travel to and from meetings and court appearances, research, preparation for meetings and court appearances, conferences with you, experts, or other attorneys, will be considered as billable time.

        4.     Statements indicating the nature of the services performed and time spent will be forwarded to you periodically.  Payment of all amounts invoiced is due within 30 days after the date stated on the invoice. Questions or objections to any statement for services rendered or costs advanced must be raised within 30 days of receipt, or you will be deemed to have approved the statement.

        5.     During the course of our representation we may be required to incur certain expenses on your behalf, and the nature of and extent of such expenses will vary with the nature of the representation. We will be entitled to reimbursement for necessary and reasonable costs and expenses incurred in connection with our work in this matter. Examples of these costs and expenses include, but are not limited to, courier charges, outside copy charges, parking and travel expenses. Offit Kurman does not charge clients for internal costs associated with regular postage, internal copies, facsimiles and long distance calls, or for overnight delivery charges.

        6.     In connection with our practice, we are often required to engage outside service providers on your behalf.  You hereby authorize us to engage such outside vendors as are reasonable and necessary in connection with our work, and to instruct such vendors to bill you directly for their services. You will be responsible for direct and timely payment of those expenses for which you are directly invoiced.  Examples of these costs include, but are not limited to, filing fees, expert witness fees, and transcript fees. Unless it is impractical because of exigent circumstances, we will discuss such expenses with you, and obtain your consent, in advance.

WASHINGTON : BALTIMORE : PHILADELPHIA : WILMINGTON : VIRGINIA



Attorneys At Law

7.      In furtherance of our continuing efforts to better serve our clients, the firm occasionally will work with outside counsel for some aspects of a particular representation when doing so is, in our opinion, economical and appropriate. The costs associated with the use of outside counsel may include charges for the supervision and administration of the outside counsel.

8.      It is impossible for us to project the amount of time that will be devoted by the firm to your needs. However, if at any time you decide that you desire that we cease further activity on your behalf, you should notify our firm in writing and, upon payment by you of the final statement for our services which will be rendered shortly after receipt by us of your intention to terminate our attorney-client relationship, copies of all pertinent papers in your file will be turned over to you or to any attorney of your selection.

9.      We may withdraw as counsel, terminate this Agreement, and be relieved of the responsibility of performing further work on your behalf, by notifying you in writing. Reasons for such termination may include, but are not limited to, failure on your part to pay fees or expenses under the terms of this Agreement in a timely manner, failure to cooperate with the firm in preparation and/or prosecution of your legal needs, reasons mandated by the rules of professional conduct governing lawyers, a significant disagreement arises as to legal strategy, or discovery of or analysis of facts and/or law which lead the firm to conclude that your matter should not be pursued. You agree to execute such documents as will permit the firm to withdraw from representing you and you agree to pay any remaining balance owed on your account.

10.     After our representation of you has ended, whether or not you have requested your file or any part of it, we may request that you or an authorized representative pick up your files or documents that have been produced during the course of the representation. Absent extenuating circumstances or those cases where our firm specifically agrees to hold certain documents for you, you agree to retrieve the documents within 90 days. If you do not want us to return these to you, please be advised that we may destroy all paper copies other than those that we determine original paper copies must be maintained. In addition, *if we have not heard back from you after the 90 day period has passed, the firm will assume that you have no objections to the destruction of your files or documents.*

11.     Should it ever become necessary for us to take legal action to collect our fees and/or any expenses due under this Fee Agreement, you agree to reimburse us fully for all costs of collection, including, but not limited to, reasonable attorneys' fees and a late fee on the unpaid balance to be calculated at the rate of twelve percent (12%) per annum.

Please countersign this letter in the space provided below for your signature to acknowledge acceptance of the terms and conditions of this engagement. **Upon receipt of this countersigned letter we will commence services on your matter.** On behalf of the firm, and holding aside the formality of this letter, we look forward to working with you.

Very truly yours,

*Lisa Shattuck*

Lisa T. Shattuck
*Client Relations Manager*

Cc:     Timothy C. Lynch, Esq.

Read & Accepted on behalf of 6879 GOLDSBORO, LLC by:

Brian King                          7/22/2013
Brian King                          Date

*Please sign and return this letter within 10 business days of receipt.*
00220225.00001

Baltimore/Washington

# Offit | Kurman

Fee Schedule

| Attorney | Rate | Attorney | Rate | Paralegal/Clerk | Rate |
|---|---|---|---|---|---|
| Allman, Alex M. | $375 | McRae, David K | $390 | Dixon, Candace O. | $175 |
| Axenfeld, Robert R. | $375 | Mercurio, Michael N. | $400 | Fee, Carol A. | $100 |
| Beller, Joseph | $400 | Neuhauser, Stanley J. | $350 | Jett, Doreen A. | $175 |
| Bellinger, Jr., Joseph J. | $450 | Nevins, Kristin M. | $350 | Jonson, Samantha G. | $160 |
| Berger, Jason C. | $350 | Niepraschk, Christi L. | $260 | Jordan, Roxanne P. | $165 |
| Berger, Russell B. | $325 | Noll, Alison K. | $400 | King, Lisa M. | $180 |
| Brooks, Sandra A. | $335 | Offit, Maurice L. | $450 | Kovacevich, Anthony | $160 |
| Brownstein, Adam R. | $325 | Offit, Theodore A. | $475 | Landicho, Kathlyn M. | $180 |
| Cannon, William P. | $275 | Ogens, Ronald L | $495 | LaScuola, Joseph C. | $160 |
| Carter, Matthew T. | $295 | Pallozzi, Angela D. | $235 | Lavin, Deborah A. | $155 |
| Casseres, Daniella | $300 | Pelino, Bryan J. | $330 | Montleth, Gina M. | $160 |
| Coaxum, David S. | $330 | Pelletier, Eric J. | $395 | Redmond, Lucia | $165 |
| Conley, Michael | $500 | Pillsbury, William H. | $360 | Rowe, Kiersten S. | $160 |
| Currey, Gregory P. | $325 | Poppleton, Miller J. | $375 | Trout, Janice C. | $155 |
| Cutler, Gary B. | $350 | Potler, B. Marvin | $350 | Whitlock, Katelynn P. | $160 |
| D'Andrea, Lindsay R.D. | $250 | Raftery, John B. | $400 | | |
| Davis, III William C. | $440 | Repczynski, Thomas W. | $375 | | |
| Delaney, Jesse D. | $390 | Rosenberg, Brian C. | $365 | | |
| Delawter, Meaghan L. | $210 | Rothman, Alyssa S. | $225 | | |
| Denick, Bernard S. | $375 | Rubenstein, Laura L. | $375 | | |
| Donnelly, Michael | $390 | Salmons, Brent T. | $400 | | |
| Donohue, Sara M. | $450 | Sanders, Alan A. | $360 | | |
| Elias, Mazin I. | $335 | Scaldara, John A. | $375 | | |
| Erskine, William E. | $425 | Seitz, Douglas H. | $350 | | |
| Ettelson, James S. | $450 | Shand, Dina | $200 | | |
| Finnerty, Meghan | $335 | Shane, Steve E. | $375 | | |
| Foster, Don P. | $450 | Shapiro, Bart | $495 | | |
| Goel, Rajiv K. | $385 | Sherman, Bryn H. | $475 | | |
| Gottlieb, Mark E. | $500 | Smith, Karen L. | $330 | | |
| Haley, Michael K. | $325 | Solomon, Glenn D. | $370 | | |
| Hepfer, Cheryl L. | $500 | Stadfeld, Max S. | $350 | | |
| Heyman, William S. | $425 | Steiner, Julius M. | $475 | | |
| Hoffman, Ira E. | $435 | Stern, Seymour B. | $350 | | |
| Hoffman, James M. | $440 | Stone, Steven David | $400 | | |
| Johnson, Gregory P. | $350 | Strickland, Elyse | $395 | | |
| Jones, Glenn M. | $500 | Thomas, William J. | $400 | | |
| Just, Marjorie | $400 | Todman, Stanley I. | $295 | | |
| Kamins, Rachel M. | $350 | Tolchin, Edward J. | $375 | | |
| Kamins, Scott V. | $425 | Turet, Craig F. | $375 | | |
| Karen, Ari | $450 | Ulman, Louis J. | $450 | | |
| Kaufman, Gal N. | $440 | VerStandig, Maurice B. | $275 | | |
| Kaufman, Stephen H. | $395 | Vogler, Philip W. | $450 | | |
| Kay, Douglas R. | $375 | Wachs, Jonathan R. | $370 | | |
| Kelting, Todd A. | $350 | Wachter, Chris | $300 | | |
| Kotkin, Diane S. | $375 | Walsh, Donald J. | $395 | | |
| Kurman, Howard K. | $450 | Walter, Harold M. | $450 | | |
| Loffredo, Brian A. | $350 | Walters, Revee M. | $235 | | |
| Lynch, Timothy C. | $450 | Wilburn, Frances C. | $325 | | |
| Marasciulo, Theodore | $400 | Wolf, Rachel M. | $335 | | |
| Mathis, Joseph B. | $250 | Yumkas, Charles | $375 | | |
| McQueen, Catherine H. | $330 | | | | |

# Exhibit C

## Greg Myers

| | |
|---|---|
| **From:** | McRae, Dave <dmcrae@offitkurman.com> |
| **Sent:** | Thursday, October 30, 2014 2:30 PM |
| **To:** | Greg Myers |
| **Subject:** | RE: Note and Guaranty |
| **Attachments:** | 141101_Promissory Note rev 10-30-14 REDLINE.docx |

Greg,

The redlined Promissory Note is attached.   Regarding non-assignability, I thought it would be more effective (and more up-front with your investor partner) not to tinker with the "pay to the order of" language at the beginning of the Note, but rather, to add new Section 19 which plainly states that the Note may not be assigned without the Borrower's prior written consent.

Apart from making the foregoing change and adding the Guaranty signature line as we discussed, I saw no other areas of the Note that needed modification.

If you have any further questions or concerns, please let me know.

Thanks,

Dave


**David K. McRae, Esquire**

**Offit | Kurman**®
Attorneys At Law

the perfect **legal partner**®

(301) 575-0378 - Direct
(410) 615-4727 - Mobile
(301) 575-0335 - Facsimile
dmcrae@offitkurman.com
www.offitkurman.com



**Baltimore/Washington**
8171 Maple Lawn Boulevard  |  Suite 200  |  Fulton, MD 20759

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**IRS CIRCULAR 230 DISCLOSURE**
To ensure compliance with requirements imposed by the IRS, we inform you that any US federal tax advice contained in this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Greg Myers [mailto:gregbmyers@verizon.net]
**Sent:** Wednesday, October 29, 2014 6:01 PM
**To:** McRae, Dave
**Cc:** gregbmyers@verizon.net
**Subject:** Note and Guaranty

Dave - give me a call after you have looked these over.

Thank you,
Greg Myers
(301) 325-2312

$250,000.00                                                     November 1, 2014

## PROMISSORY NOTE

FOR VALUE RECEIVED, the undersigned, SERV TRUST, a Maryland statutory trust (the "Borrower"), promises to pay to the order of 6789 GOLDSBORO LLC (the "Holder"), the principal sum of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00), together with interest on the unpaid principal balance outstanding from time to time at the rate or rates hereafter specified and any and all other sums which may be owing to Holder by Borrower pursuant to this Promissory Note (the "Note"). Payments of all sums due under this Note shall be paid in lawful money of the United States of America which shall be legal tender in payment of all debts and dues. The following terms shall apply to this Note.

1.      Interest. The principal amount outstanding from time to time hereunder shall bear interest at a fixed rate of ten percent (10.0%) per annum. Interest shall accrue through the Maturity Date and be calculated on the basis of a year of three hundred sixty (360) days applied to the actual days on which there exists an unpaid balance under this Note.

2.      Maturity Date. Unless sooner paid, Borrower shall pay the entire outstanding principal amount, together with all accrued and unpaid interest thereon and all other sums due under this Note that remain unpaid, on the earlier of (a) within thirty (30) days of the date of closing on the sale of the property owned by Holder known as 6789 Goldsboro Road, Bethesda, Maryland 20817, or (b) October 31, 2018, which is the final and absolute due date of this Note (the "Maturity Date"). Borrower acknowledges and agrees that this Note contemplates a balloon payment of principal and accrued interest on the Maturity Date.

3.      Repayment Extension. If any payment of principal or interest shall be due on a Saturday, Sunday or any other day on which banking institutions in the State of Maryland are required or permitted to be closed, such payment shall be made on the next succeeding business day and such extension of time shall be included in computing interest under this Note.

4.      Application of Payments. All payments made under this Note may, in Holder's sole discretion, be applied first to any sums owed to Holder hereunder, next to accrued and unpaid interest, and the balance to the repayment of principal, or in such other order or proportion as Holder, in its sole discretion, may elect from time to time.

5.      Prepayment. This Note may be prepaid in whole or in part at any time without premium or penalty.

6.      Events of Default; Acceleration. The following shall each constitute an "Event of Default" under this Note: (a) the failure of Borrower to make payment in full of all sums due under this Note on or before the Maturity Date; or (b) Borrower makes a general assignment for the benefit of creditors or if a voluntary or involuntary case is commenced against Borrower under the Bankruptcy Code or any similar federal or state statute. Upon the occurrence of an Event of Default, Holder, in Holder's sole discretion and without notice or demand, may declare the entire unpaid principal balance of this Note, together with all accrued interest and all other sums due under this Note to be immediately due and payable and may exercise any and all rights and remedies available to Holder hereunder and/or under applicable law. Any failure by Holder to

3218014.1 27336/122546

exercise this right of acceleration shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. In no event shall this Section be construed as an agreement or privilege to extend the Maturity Date, nor as a waiver of any other right or remedy accruing to Holder by reason of the occurrence of any Event of Default.

7.    Expenses of Collection.  In the event of an Event of Default, Borrower agrees to pay to Holder and reimburse Holder upon demand for any and all costs and expenses, including all reasonable attorneys' fees and court costs, if any, incurred by Holder in connection with the enforcement or collection of this Note, whether or not any action has been commenced by Holder to enforce or collect this Note.

8.    Interest Rate After Judgment.  If judgment is entered against Borrower on this Note, the amount of the judgment entered (which may include principal, interest, fees and costs) shall bear interest at the higher of (a) ten percent (10%) per annum, or (b) the legal rate of interest then applicable to judgments in the jurisdiction in which the judgment was entered, to be determined on the date of the entry of the judgment, until the judgment is paid in full.

9.    Certain Waivers By Borrower.  Borrower waives demand, presentment, notice of dishonor, protest, protest and demand, notice of protest, and notice of non-payment of this Note. Holder, without compromising, impairing, modifying, diminishing, or in any way releasing or discharging Borrower from Borrower's obligations hereunder and without notifying or obtaining the prior approval of Borrower at any time or from time to time, may: (a) grant extensions of time for payment or performance by Borrower; (b) release in whole or in part Borrower.

10.    Commercial Loan.  Borrower acknowledges and warrants that the debt evidenced by this Note is a "commercial loan" within the meaning of Title 12 of the Commercial Law Article of the Annotated Code of Maryland (2000 Rep. Vol.).

11.    Non-Waiver By Holder.  The rights and remedies of Holder under this Note shall be cumulative and concurrent and may be pursued singularly, successively or together at the sole discretion of Holder, and may be exercised as often as occasion therefor shall occur, and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release of the same or any other right or remedy. By accepting full or partial payment after the due date of any amount of principal or of interest on this Note, Holder shall not be deemed to have waived the right either to require prompt payment when due and payable of all other amounts of principal or of interest on this Note or to exercise any remedies available to it in order to collect all such other amounts due and payable under this Note. No delay in the exercise of or failure to exercise, any right, remedy or power accruing upon any default or failure of Borrower in the performance of any obligation under this Note shall impair any such right, remedy or power or shall be construed to be a waiver thereof, but any such right, remedy, or power may be exercised from time to time and as often as may be deemed by Holder expedient. If Borrower should default in the performance of any obligation under this Note, and such default should thereafter be waived by Holder, such waiver shall be limited to the particular default so waived.

12.    Evidence of Indebtedness.  This Note is given and accepted as evidence of indebtedness only.

13.    Time of the Essence.  Time is of the essence under this Note.

2

3218014.1 27336/122546

14.    <u>Notices</u>.    Any notice or demand required or permitted by or in connection with this Note must be in writing, and shall be deemed duly given and received one (1) business day after being deposited with Federal Express, or three (3) business days after being deposited in the United States mail, postage prepaid, first class, registered or certified, return receipt requested.    Notices shall be addressed as follows: (i) if to Holder, at 3925 Beech Avenue, Baltimore, Maryland 21211, and if to Borrower, at 4505 Wetherill Road, Bethesda, Maryland 20816.    Any party may, at any time by giving five (5) days' written notice to the other party, designate any other address in substitution of the foregoing address to which such notice shall be given and other parties to whom copies of all notices hereunder shall be sent.    Notwithstanding anything to the contrary contained herein, all notices and demands for payment from Holder actually received in writing by Borrower shall be considered to be effective upon the receipt thereof by Borrower regardless of the procedure or method utilized to accomplish delivery thereof to Borrower.

15.    <u>Choice of Law; Consent to Venue and Jurisdiction</u>.    This Note shall be governed, construed and interpreted strictly in accordance with the laws of the State of Maryland (without regard to conflicts of law principles that would apply the law of another jurisdiction).    Borrower consents to the jurisdiction and venue of the courts of Maryland in any action or judicial proceeding brought to enforce, construe or interpret this Note.    Borrower agrees to stipulate in any future proceeding that this Note is to be considered for all purposes to have been executed and delivered within the geographical boundaries of the State of Maryland, even if it was, in fact, executed and delivered elsewhere.

16.    <u>Actions Against Holder</u>.    Any action brought by Borrower against Holder which is based, directly or indirectly or in whole or in part, on this Note or any matter in or related to this Note, including but not limited to the making of the loan or the administration or collection thereof, shall be brought only in the courts of the State of Maryland.    All costs and expenses, including all attorneys' fees, incurred by Holder in successfully defending any such action or counterclaim brought by Borrower against Holder shall be paid by Borrower to Holder.    All costs and expenses, including all attorneys' fees, incurred by Borrower in successfully prosecuting any such action or counterclaim brought by Borrower against Holder shall be paid by Holder to Borrower.

17.    <u>WAIVER OF JURY TRIAL</u>.    BORROWER AND HOLDER AGREE THAT ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT OR INSTITUTED BY BORROWER OR HOLDER OR ANY SUCCESSOR OF BORROWER OR HOLDER ON OR WITH RESPECT TO THIS NOTE OR WHICH IN ANY WAY RELATES, DIRECTLY OR INDIRECTLY, TO THE OBLIGATIONS OF BORROWER TO HOLDER UNDER THIS NOTE OR THE DEALINGS OF THE PARTIES WITH RESPECT THERETO SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY.    BORROWER AND HOLDER HEREBY EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING.    Borrower acknowledges and agrees that this waiver is knowingly, intelligently and voluntarily made by Borrower, that this provision is a specific and material aspect of the agreement between the parties and that Holder would not enter into the transaction with Borrower if this provision were not part of their agreement.    Borrower further acknowledges that Borrower has been represented (or has had the opportunity to be represented) in the signing of this Note and in the making of this waiver by independent legal counsel selected of Borrower's own free will and that Borrower has had the opportunity to discuss this waiver with counsel.

3

18.    <u>Miscellaneous</u>. Neither this Note nor any term hereof may be terminated, amended, supplemented, waived, released or modified orally, but only by an instrument in writing signed by the party against which the enforcement of the termination, amendment, supplement, waiver, release, or modification is sought. Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine or neuter gender shall include all genders. All persons signing on behalf of Borrower represent that they are authorized to do so and that all actions necessary for Borrower to execute and deliver this Note have been taken. The headings used in this Note are for convenience only and are not to be interpreted as a part of this Note. This Note constitutes the entire agreement between the parties with respect to its subject matter and supercedes all prior representations or agreements, oral or written, with respect thereto.

19.    ASSIGNMENT.  THIS NOTE IS NOT ASSIGNABLE EXCEPT WITH THE PRIOR WRITTEN CONSENT OF BORROWER.

[Signatures on following page.]

3218014.1 27336/122546

IN WITNESS WHEREOF, Borrower has executed this Note specifically intending this Note to be effective as of November 1, 2014 and to constitute an instrument under seal.

WITNESS:                          BORROWER:

                                 SERV TRUST, a Maryland Statutory Trust

_____          By: _____ (SEAL)
                                      Gregory B. Myers, Trustee


_____          By: _____ (SEAL)
                                      Daniel J. Ring, Trustee


### GUARANTY

The undersigned hereby personally and individually, and not in his capacity as Trustee, unconditionally guarantees payment (and not merely collection) of the foregoing instrument.


                                 _____ (SEAL)
                                 Gregory B. Myers, personally


5

3218014.1 27336/122546

**Greg Myers**

| | |
|---|---|
| **From:** | McRae, Dave <dmcrae@offitkurman.com> |
| **Sent:** | Thursday, October 30, 2014 5:04 PM |
| **To:** | Greg Myers |
| **Subject:** | RE: Note and Guaranty |
| **Attachments:** | 141101_Promissory Note rev2 10-30-14 REDLINE.docx |

Greg,

Please see the attached further revised ("rev2") redline draft, and let me know if it is acceptable. The only change is the insertion of Section 20.

Thanks,

Dave

**David K. McRae, Esquire**

**Offit│Kurman®**
Attorneys At Law

the perfect **legal partner®**

(301) 575-0378 - Direct
(410) 615-4727 - Mobile
(301) 575-0335 - Facsimile
<u>dmcrae@offitkurman.com</u>
<u>www.offitkurman.com</u>

    

**Baltimore/Washington**
8171 Maple Lawn Boulevard | Suite 200 | Fulton, MD 20759

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential. It is solely intended for use by the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**IRS CIRCULAR 230 DISCLOSURE**
To ensure compliance with requirements imposed by the IRS, we inform you that any US federal tax advice contained in this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Greg Myers [mailto:gregbmyers@verizon.net]
**Sent:** Thursday, October 30, 2014 4:31 PM
**To:** McRae, Dave
**Cc:** gregbmyers@verizon.net
**Subject:** RE: Note and Guaranty

Dave - can you add a Section 20 with appropriate language to convey that that under no circumstances is Daniel J. Ring personally or individually liable or responsible for any portion of the debt.

1

Thank you,
Greg Myers

---

**From:** McRae, Dave [mailto:dmcrae@offitkurman.com]
**Sent:** Thursday, October 30, 2014 2:30 PM
**To:** Greg Myers
**Subject:** RE: Note and Guaranty

Greg,

The redlined Promissory Note is attached.   Regarding non-assignability, I thought it would be more effective (and more up-front with your investor partner) not to tinker with the "pay to the order of" language at the beginning of the Note, but rather, to add new Section 19 which plainly states that the Note may not be assigned without the Borrower's prior written consent.

Apart from making the foregoing change and adding the Guaranty signature line as we discussed, I saw no other areas of the Note that needed modification.

If you have any further questions or concerns, please let me know.

Thanks,

Dave


**David K. McRae, Esquire**

**Offit | Kurman**®
Attorneys At Law

the perfect **legal partner**®

(301) 575-0378 - Direct
(410) 615-4727 - Mobile
(301) 575-0335 - Facsimile
dmcrae@offitkurman.com
www.offitkurman.com

     

**Baltimore/Washington**
8171 Maple Lawn Boulevard  |  Suite 200  |  Fulton, MD 20759

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**IRS CIRCULAR 230 DISCLOSURE**
To ensure compliance with requirements imposed by the IRS, we inform you that any US federal tax advice contained in this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Greg Myers [mailto:gregbmyers@verizon.net]
**Sent:** Wednesday, October 29, 2014 6:01 PM

**To:** McRae, Dave
**Cc:** gregbmyers@verizon.net
**Subject:** Note and Guaranty

Dave - give me a call after you have looked these over.

Thank you,
Greg Myers
(301) 325-2312

$250,000.00                                          November 1, 2014

<u>PROMISSORY NOTE</u>

FOR VALUE RECEIVED, the undersigned, SERV TRUST, a Maryland statutory trust (the "<u>Borrower</u>"), promises to pay to the order of 6789 GOLDSBORO LLC (the "<u>Holder</u>"), the principal sum of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00), together with interest on the unpaid principal balance outstanding from time to time at the rate or rates hereafter specified and any and all other sums which may be owing to Holder by Borrower pursuant to this Promissory Note (the "<u>Note</u>"). Payments of all sums due under this Note shall be paid in lawful money of the United States of America which shall be legal tender in payment of all debts and dues. The following terms shall apply to this Note.

1.      <u>Interest</u>. The principal amount outstanding from time to time hereunder shall bear interest at a fixed rate of ten percent (10.0%) per annum. Interest shall accrue through the Maturity Date and be calculated on the basis of a year of three hundred sixty (360) days applied to the actual days on which there exists an unpaid balance under this Note.

2.      <u>Maturity Date</u>. Unless sooner paid, Borrower shall pay the entire outstanding principal amount, together with all accrued and unpaid interest thereon and all other sums due under this Note that remain unpaid, on the earlier of (a) within thirty (30) days of the date of closing on the sale of the property owned by Holder known as 6789 Goldsboro Road, Bethesda, Maryland 20817, or (b) October 31, 2018, which is the final and absolute due date of this Note (the "<u>Maturity Date</u>"). Borrower acknowledges and agrees that this Note contemplates a balloon payment of principal and accrued interest on the Maturity Date.

3.      <u>Repayment Extension</u>. If any payment of principal or interest shall be due on a Saturday, Sunday or any other day on which banking institutions in the State of Maryland are required or permitted to be closed, such payment shall be made on the next succeeding business day and such extension of time shall be included in computing interest under this Note.

4.      <u>Application of Payments</u>. All payments made under this Note may, in Holder's sole discretion, be applied first to any sums owed to Holder hereunder, next to accrued and unpaid interest, and the balance to the repayment of principal, or in such other order or proportion as Holder, in its sole discretion, may elect from time to time.

5.      <u>Prepayment</u>. This Note may be prepaid in whole or in part at any time without premium or penalty.

6.      <u>Events of Default; Acceleration</u>. The following shall each constitute an "<u>Event of Default</u>" under this Note: (a) the failure of Borrower to make payment in full of all sums due under this Note on or before the Maturity Date; or (b) Borrower makes a general assignment for the benefit of creditors or if a voluntary or involuntary case is commenced against Borrower under the Bankruptcy Code or any similar federal or state statute. Upon the occurrence of an Event of Default, Holder, in Holder's sole discretion and without notice or demand, may declare the entire unpaid principal balance of this Note, together with all accrued interest and all other sums due under this Note to be immediately due and payable and may exercise any and all rights and remedies available to Holder hereunder and/or under applicable law. Any failure by Holder to

3218014.1 27336/122546

exercise this right of acceleration shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. In no event shall this Section be construed as an agreement or privilege to extend the Maturity Date, nor as a waiver of any other right or remedy accruing to Holder by reason of the occurrence of any Event of Default.

7.      Expenses of Collection.   In the event of an Event of Default, Borrower agrees to pay to Holder and reimburse Holder upon demand for any and all costs and expenses, including all reasonable attorneys' fees and court costs, if any, incurred by Holder in connection with the enforcement or collection of this Note, whether or not any action has been commenced by Holder to enforce or collect this Note.

8.      Interest Rate After Judgment.   If judgment is entered against Borrower on this Note, the amount of the judgment entered (which may include principal, interest, fees and costs) shall bear interest at the higher of (a) ten percent (10%) per annum, or (b) the legal rate of interest then applicable to judgments in the jurisdiction in which the judgment was entered, to be determined on the date of the entry of the judgment, until the judgment is paid in full.

9.      Certain Waivers By Borrower.   Borrower waives demand, presentment, notice of dishonor, protest, protest and demand, notice of protest, and notice of non-payment of this Note. Holder, without compromising, impairing, modifying, diminishing, or in any way releasing or discharging Borrower from Borrower's obligations hereunder and without notifying or obtaining the prior approval of Borrower at any time or from time to time, may: (a) grant extensions of time for payment or performance by Borrower; (b) release in whole or in part Borrower.

10.      Commercial Loan.   Borrower acknowledges and warrants that the debt evidenced by this Note is a "commercial loan" within the meaning of Title 12 of the Commercial Law Article of the Annotated Code of Maryland (2000 Rep. Vol.).

11.      Non-Waiver By Holder.   The rights and remedies of Holder under this Note shall be cumulative and concurrent and may be pursued singularly, successively or together at the sole discretion of Holder, and may be exercised as often as occasion therefor shall occur, and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release of the same or any other right or remedy. By accepting full or partial payment after the due date of any amount of principal or of interest on this Note, Holder shall not be deemed to have waived the right either to require prompt payment when due and payable of all other amounts of principal or of interest on this Note or to exercise any remedies available to it in order to collect all such other amounts due and payable under this Note. No delay in the exercise of or failure to exercise, any right, remedy or power accruing upon any default or failure of Borrower in the performance of any obligation under this Note shall impair any such right, remedy or power or shall be construed to be a waiver thereof, but any such right, remedy, or power may be exercised from time to time and as often as may be deemed by Holder expedient. If Borrower should default in the performance of any obligation under this Note, and such default should thereafter be waived by Holder, such waiver shall be limited to the particular default so waived.

12.      Evidence of Indebtedness.   This Note is given and accepted as evidence of indebtedness only.

13.      Time of the Essence.   Time is of the essence under this Note.

2

3218014.1 27336/122546

14.   Notices. Any notice or demand required or permitted by or in connection with this Note must be in writing, and shall be deemed duly given and received one (1) business day after being deposited with Federal Express, or three (3) business days after being deposited in the United States mail, postage prepaid, first class, registered or certified, return receipt requested.  Notices shall be addressed as follows: (i) if to Holder, at 3925 Beech Avenue, Baltimore, Maryland 21211, and if to Borrower, at 4505 Wetherill Road, Bethesda, Maryland 20816.  Any party may, at any time by giving five (5) days' written notice to the other party, designate any other address in substitution of the foregoing address to which such notice shall be given and other parties to whom copies of all notices hereunder shall be sent.  Notwithstanding anything to the contrary contained herein, all notices and demands for payment from Holder actually received in writing by Borrower shall be considered to be effective upon the receipt thereof by Borrower regardless of the procedure or method utilized to accomplish delivery thereof to Borrower.

15.   Choice of Law; Consent to Venue and Jurisdiction.  This Note shall be governed, construed and interpreted strictly in accordance with the laws of the State of Maryland (without regard to conflicts of law principles that would apply the law of another jurisdiction).  Borrower consents to the jurisdiction and venue of the courts of Maryland in any action or judicial proceeding brought to enforce, construe or interpret this Note.  Borrower agrees to stipulate in any future proceeding that this Note is to be considered for all purposes to have been executed and delivered within the geographical boundaries of the State of Maryland, even if it was, in fact, executed and delivered elsewhere.

16.   Actions Against Holder.  Any action brought by Borrower against Holder which is based, directly or indirectly or in whole or in part, on this Note or any matter in or related to this Note, including but not limited to the making of the loan or the administration or collection thereof, shall be brought only in the courts of the State of Maryland.  All costs and expenses, including all attorneys' fees, incurred by Holder in successfully defending any such action or counterclaim brought by Borrower against Holder shall be paid by Borrower to Holder.  All costs and expenses, including all attorneys' fees, incurred by Borrower in successfully prosecuting any such action or counterclaim brought by Borrower against Holder shall be paid by Holder to Borrower.

17.   WAIVER OF JURY TRIAL.  BORROWER AND HOLDER AGREE THAT ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT OR INSTITUTED BY BORROWER OR HOLDER OR ANY SUCCESSOR OF BORROWER OR HOLDER ON OR WITH RESPECT TO THIS NOTE OR WHICH IN ANY WAY RELATES, DIRECTLY OR INDIRECTLY, TO THE OBLIGATIONS OF BORROWER TO HOLDER UNDER THIS NOTE OR THE DEALINGS OF THE PARTIES WITH RESPECT THERETO SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY.  BORROWER AND HOLDER HEREBY EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING. Borrower acknowledges and agrees that this waiver is knowingly, intelligently and voluntarily made by Borrower, that this provision is a specific and material aspect of the agreement between the parties and that Holder would not enter into the transaction with Borrower if this provision were not part of their agreement.  Borrower further acknowledges that Borrower has been represented (or has had the opportunity to be represented) in the signing of this Note and in the making of this waiver by independent legal counsel selected of Borrower's own free will and that Borrower has had the opportunity to discuss this waiver with counsel.

3

3218014.1 27336/122546

18.    Miscellaneous.  Neither this Note nor any term hereof may be terminated, amended, supplemented, waived, released or modified orally, but only by an instrument in writing signed by the party against which the enforcement of the termination, amendment, supplement, waiver, release, or modification is sought.  Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine or neuter gender shall include all genders.  All persons signing on behalf of Borrower represent that they are authorized to do so and that all actions necessary for Borrower to execute and deliver this Note have been taken.  The headings used in this Note are for convenience only and are not to be interpreted as a part of this Note.  This Note constitutes the entire agreement between the parties with respect to its subject matter and supercedes all prior representations or agreements, oral or written, with respect thereto.

19.    ASSIGNMENT.  THIS NOTE IS NOT ASSIGNABLE EXCEPT WITH THE PRIOR WRITTEN CONSENT OF BORROWER.

20.    Signatories for Borrower.  The undersigned signatories for Borrower, Gregory B. Myers and Daniel J. Ring, sign this Note and undertake the obligations of Borrower herein contained in their capacities as Trustees for Borrower (a Maryland statutory trust) only, and not in their individual capacities.  While it is acknowledged that Gregory B. Myers, in his individual capacity, and not in his capacity as Trustee, has also agreed to be a personal guarantor of this Note, as evidenced by his separate signature of the Guaranty contained below, under no circumstances shall Daniel J. Ring be deemed to be personally or individually liable or responsible for any portion of the debt evidenced by this Note.

[Signatures on following page.]

4

3218014.1 27336/122546

IN WITNESS WHEREOF, Borrower has executed this Note specifically intending this Note to be effective as of November 1, 2014 and to constitute an instrument under seal.

WITNESS:                          BORROWER:

SERV TRUST, a Maryland Statutory Trust

_____   By: _____ (SEAL)
                             Gregory B. Myers, Trustee

_____   By: _____ (SEAL)
                             Daniel J. Ring, Trustee

### GUARANTY

The undersigned hereby personally and individually, and not in his capacity as Trustee, unconditionally guarantees payment (and not merely collection) of the foregoing instrument.

_____ (SEAL)
           Gregory B. Myers, personally

5

3218014.1 27336/122546

# Exhibit D

**Greg Myers**

| | |
|---|---|
| **From:** | Lynch, Timothy <tlynch@offitkurman.com> |
| **Sent:** | Tuesday, June 18, 2013 2:48 PM |
| **To:** | Greg Myers; Brian King |
| **Subject:** | FW: DC Property |

Gents: I am making this email intro – though I have spoken with each of you about this matter. Greg, Brian can meet with you in Baltimore at his place.  I can make my office in Baltimore available to you all as well. I do not need to be at your meeting.  I will leave it to you all to work out the details of your meeting place and time.  I am happy to be assistance to you all – but to the extent you need anything from me but keep in mind that as you are both clients, I am in a position where I cannot advise either of you about the deal. The most I could do is created documents with terms that you all have agreed to.

Regards,

Tim Lynch

# Exhibit E

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| | | |
|---|---|---|
| BRIAN KING, *et al.* | : | |
| Plaintiffs, | : | |
| v. | : | **Consolidated Proceeding** |
| | | **Lead Case No.: 436977-V** |
| SERV TRUST, *et al.* | : | |
| Defendants, | : | |
| and | : | RECEIVED |
| ROGER SCHLOSSBERG | : | MAY 1 0 2019 |
| *In His Official Capacity as Trustee* | | |
| *of the Bankruptcy Estate of Gregory Myers* | : | Clerk of the Circuit Court |
| | | Montgomery County, Md. |
| Nominal Defendant. | : | |

<u>**MOTION FOR PARTIAL SUMMARY JUDGMENT AND REQUEST FOR HEARING**</u>

Come now Brian King ("Mr. King"), Cristina King ("Mrs. King"), and Brian King in his capacity as trustee of the Cristina and Brian King Children's Trust (the "Trustee of the Children's Trust," with the trust itself being known as the "Children's Trust") (Mr. King, Mrs. King, and the Trustee of the Children's Trust collectively known as the "Plaintiffs" or "King Parties" and each sometimes being known as a "Plaintiff"), by and through undersigned counsel, and move this Honorable Court to enter summary judgment on Count II of the Plaintiffs' First Amended Complaint, declaring Serv Trust to be the alter ego of Gregory Myers, and in support thereof state as follows:

I.     **Introduction**

The instant litigation involves myriad claims between Serv Trust ("Serv Trust") and the King Parties, concerning 6789 Goldsboro LLC ("Goldsboro"). Yet no other cause of action in this consolidated matter should – or, indeed, can – proceed, if Serv Trust is the legal alter ego of Gregory B. Myers ("Mr. Myers"), a debtor in bankruptcy, as such would render Serv Trust an asset

1

of Mr. Myers' bankruptcy estate.[1] And as the evidence herein makes clear, there is no genuine

dispute but that Serv Trust is, and at all times relevant has been, Mr. Myers' alter ego.

As set forth below, it is quite clear no trial is needed in this matter. In the realm of veil

piercing and alter ego cases, this one is not a close call, as Mr. Myers has used Serv Trust as a

dagger and shield, for numerous years, to keep assets beyond the reach of his numerous creditors,

to obtain hundreds of thousands of dollars of monies without notifying the bankruptcy court

overseeing his estate, to frustrate the efforts of his creditors through the fraudulent inflation of a

lien, to pay his personal legal fees, to pay for his personal bankruptcy, and to otherwise tend to

those obligations that would otherwise befall his wife (also a recent bankruptcy debtor) and

himself.

**II.        Factual Background: Mr. Myers' Bankruptcy and Serv Trust**

On November 18, 2015 (the "Petition Date"), Mr. Myers filed a voluntary petition for

bankruptcy relief pursuant to Section 301 of Title 11 of the United States Code (the "Bankruptcy

Code") and thereby commenced a Chapter 11 bankruptcy case designated as case number 15-

26033 in the United States Bankruptcy Court for the District of Maryland (the "Myers

Bankruptcy"). *See* Bankruptcy Petition, attached hereto as Exhibit A.

While a debtor in Chapter 11, Mr. Myers' bad acts were sufficiently numerous that the

court saw fit to convert his case to one under Chapter 7 of the Bankruptcy Code. In a subsequent

memorandum opinion, the Bankruptcy Court would observe, *inter alia,* "Myers' failure to list

Goldsboro in his initial schedules and his failure to disclose his personal guaranty of Goldsboro's

---

[1] *See* 11 U.S.C. §§ 348, 541 (establishing assets of a debtor's bankruptcy estate); 11 U.S.C. § 704 (directing the bankruptcy estate's trustee to take charge of, and liquidate, the estate's assets); 28 U.S.C. § 157(b)(2)(O) (establishing proceedinga concerning the liquidation of bankruptcy estate assets to be the jurisdictional purview of the bankruptcy court).

advances to Serv Trust at the 341 Meeting was a significant factor in the Court's decision to convert Myers' case." *See United States Trustee v. Myers,* Case No. 17-00193 (Bankr. D. Md. 2017), at DE #94 (the "Order Denying Discharge," a copy of which is attached hereto as Exhibit B ("Ex. B")).

Following conversion of Mr. Myers' bankruptcy to a proceeding under Chapter 7, the Bankruptcy Court denied Mr. Myers' discharge in response to a complaint brought by the United States Trustee. In denying Mr. Myers' discharge, the Bankruptcy Court observed, *inter alia*:

> The numerous falsities [of Mr. Myers] indicate a cavalier attitude toward his schedules and a reckless disregard for the truth sufficient to deny him a discharge under § 727(a)(4)(A). His lack of candor and credibility left his creditors, the United States Trustee and the Chapter 7 Trustee constantly playing catch up to get an understanding of his finances and even after multiple amendments to his schedules, his true financial condition was never clear.

Order Denying Discharge, Ex. B, at pp. 22-23. The same order went on to further note how Mr. Myers used Serv Trust to place – and fraudulently inflate – a lien on one of his own properties, so as to frustrate the collection efforts of creditors:

> [T]he Court finds that Myers fraudulently and intentionally inflated Serv Trust's lien in the Lot 6 Sale Proceeds on his Amended Schedule D and that the false claim is sufficient to deny him a discharge under § 727(a)(4)(B).

Order Denying Discharge, Ex B, at p. 28.

The Bankruptcy Court proceeded to address Mr. Myers' wholesale failure to account for the vast sums he looted from Serv Trust during a relevant time period:

> There is simply no way for the Court to determine with any accuracy how Myers dissipated more than $1.3 million during the three years preceding his bankruptcy filing. There was no evidence of what bills or expenses he paid or whether certain expenses were paid directly from Serv Trust or Myers' family members. Instead, Myers offered vague and uncorroborated estimates of his expenses during the three years prior to his bankruptcy filing.

Order Denying Discharge, Ex B, at pp. 34-35.

Much of the money Mr. Myers took from Serv Trust came from Goldsboro – the real estate entity at the heart of the litigation *sub judice*. Specifically, while Serv Trust was a subordinate junior partner of the King Parties, in Goldsboro, Mr. Myers asked Mr. King to make dozens of loans from the entity, for Mr. Myers' personal benefit, and Mr. King complied. *See* Affidavit of Brian King ("King Affidavit"), attached hereto as Exhibit C ("Ex. C"), at ¶ 3.

Indeed, while Mr. Myers told the Bankruptcy Court all monies received from Serv Trust were for the benefit of his children, the record herein reveals otherwise. From 2014 through 2016 (the latter being a date *after* Mr. Myers was a debtor in bankruptcy and under the supervision of the Bankruptcy Court), Mr. Myers asked Mr. King to fund Goldsboro with money for loans to be made on at least twenty eight (28) separate occasions, with the total principal of such loans equaling Six Hundred Thirty Thousand Dollars ($630,000.00) (the "Loans"). *See* Deposition of Brian King ("King Depo"), attached hereto as Exhibit D ("Ex. D"), at 91:3-92:12; Promissory Note, attached hereto as Exhibit E; King Aff., Ex. C, at ¶ 3.

Even *after* Mr. Myers was a debtor in bankruptcy – and, ergo, not permitted to borrow funds or take income without the approval of, or notification to, the Bankruptcy Court – his discourse in demanding loans from Goldsboro continued to reveal the self-dealing nature of his relationship with Serv Trust. By way of example, on April 22, 2016, Mr. Myers wrote to Mr. King, "Hey Brian - following up on our conversation the other day - I greatly appreciate you advancing June and July now ($30k) as the insurance company totally f'd me, and I'm on fumes here." *See* April 22, 2016 e-mail, attached hereto as Exhibit F.

Mr. Myers followed up on April 25, 2016, "Brian - I'm dead in the water without the wire on/before May 2. Please reconsider and advance $15k on Monday May 2 (June advance), with the other $15k on May 8 (July advance). I wouldn't ask you to do this unless it was an

4

emergency." *See* April 25, 2016 e-mail, attached hereto as Exhibit G.

On June 9, 2016, Mr. Myers sent Mr. King another request for money, indicating that some of the money was needed for one of his children but that most of it was for other, completely unrelated things: "I only want to ask you for what I need to survive right now, which is $40k (which includes $15k to pay past tuition for Teddy so he can get his official transcript from Furman to transfer to Trinitiy; **$5k to keep my Chapter 11 alive**, $2,270 for monthly health insurance premiums; $3,500 in past due utilities; **$10k in legal fees for appeals**; food, gas, etc.)" *See* June 9, 2016 e-mail, attached hereto as Exhibit H (emphasis added).

On August 10, 2016, Mr. Myers wrote to Mr. King, again demanding monies be loaned to Serv Trust for Mr. Myers' personal utilization, noting such monies are being used for his personal ongoing expenses, and threatening bad things to befall the Goldsboro project if his personal expenses are not paid through Serv Trust:

> I received a revised set of papers yesterday from Danielle in which you now apparently will make no further advances to Serv Trust. I instructed David Miller to not review them.
>
> Your decision hurts me, and could possibly put the project in jeopardy. **If I cannot pay my ongoing expenses, then I suspect this will not end well.**

*See* August 10, 2016 e-mail, attached hereto as Exhibit I (emphasis added).

These communications were emblematic of a pattern and practice engaged by Mr. Myers, where he would have monies loaned to Serv Trust (though they sometimes went directly to him), so they could then be immediately converted to his personal possession, for his personal use. *See* Exhibits, *passim*.

### III.    Background: Mr. Myers' Use of Serv Trust to Deal with the Parties Herein

It is impossible to separate Mr. Myers' bankruptcy from this case, as Goldsboro – the entity capitalized by the King Parties – has been the primary source of the Serv Trust funds for which

Mr. Myers has refused to account to the Bankruptcy Court. But for the existence of Goldsboro (and, by extension, the business partnership giving rise to this litigation), Mr. Myers would not have had a vehicle from which to borrow funds outside the scope of his bankruptcy, finance his lifestyle while a debtor in bankruptcy, pay off personal legal fees, and repeatedly and habitually undermine the bankruptcy process.

Yet even if one were to endeavor to view Serv Trust solely in the prism of this case, a pattern and practice of self-dealing, alter ego machinations, and bad faith would nonetheless be revealed. The Myers Bankruptcy may shed light on Mr. Myers' patterns, tendencies, and inequitable eccentricities, but the same traits are amply demonstrated through the record herein.

Mr. Myers discovered a parcel of property in Bethesda, Maryland, which he thought suitable for development. *See* Deposition of Serv Trust ("Serv Trust Depo"), attached hereto as Exhibit J ("Ex. J"), at 130:11-131:7. On the recommendation of an acquaintance, he approached Mr. King about financing the acquisition of the property. *See* King Depo, Ex. D, at 16:6-25

At the time, Mr. Myers was heavily indebted to myriad creditors, and facing the clear prospect of filing bankruptcy. *See* Debtor's Amended Schedules from Myers Bankruptcy, attached hereto as Exhibit K. He thus asked the investment be put in the name of Serv Trust. *See* King Aff., Ex. C, at ¶ 4.

Even though the investment was in the name of Serv Trust, Mr. Myers personally managed the resulting operation for several years and habitually referred to it as being his own. *See* King Aff., Ex. C, at ¶ 5. This was consistent with Mr. Myers viewing his work as the necessary contribution of "sweat equity," since the King Parties had fully capitalized Goldsboro and Serv Trust's one half subordinate interest far exceeded any traditional finder's fee. *See* King Aff., Ex. C, at ¶ 6.

6

As the project continued, and Mr. Myers' personal financial condition became more and more desperate, he would repeatedly ask Mr. King to bestow the entity with monies to be loaned to himself. *See* King Aff., Ex. C, at ¶¶ 3, 7. And while all funds were putatively loaned to Serv Trust, Mr. Myers never shied away from using the first person, or identifying his own personal needs, in specifying why he needed the subject loans. *See* April 22, 2016 e-mail, attached hereto as Exhibit F; April 25, 2016 e-mail, attached hereto as Exhibit F; June 9, 2016 e-mail, attached hereto as Exhibit H; *See* August 10, 2016 e-mail, attached hereto as Exhibit I.

This activity amplified once Mr. Myers was a debtor in bankruptcy. *See* King Aff., Ex. C, at ¶ 8. While Mr. Myers would later characterize the loans made to him, following his filing of bankruptcy, as being "income" to his wife (which he would later recharacterize as loans to his wife), his wife had no dealings with Goldsboro, all communications seeking loans came from Mr. Myers, and all requests for loans from Mr. Myers to Mr. King were stated in the prism of Mr. Myers needing the money – not his wife wishing to borrow the funds. *See* Order Denying Discharge, Ex. B, at pp. 4-5; King Aff., Ex. C, at ¶ 9.

On at least one occasion, Mr. Myers asked the monies being loaned to him not even pass through the fictitious structure of Serv Trust and, instead, be given to him directly. *See* King Aff., Ex. C, at ¶ 10. On at least one occasion, Goldsboro complied and extended the money to Mr. Myers directly. *See* King Aff., Ex. C, at ¶ 11. This was not unusual or strange, as it was always understood that the monies being taken out of Goldsboro were for Mr. Myers' personal use, and Serv Trust was just a structure he was utilizing to shield funds from other creditors. *See* King Aff., Ex. C, at ¶ 11.

IV.    **Background: Mr. Myers' Invocation of Bankruptcy Stays**

Tellingly, when this case was originally filed – long before Mr. Myers was personally a party hereto, and only Serv Trust was a defendant in this proceeding – Mr. Myers docketed a suggestion of bankruptcy, indicating the Myers Bankruptcy in the Maryland Bankruptcy Court to act as a stay on these proceedings. *See* DE #13. That Mr. Myers regarded his personal bankruptcy to be operative as a stay on any proceeding concerning the assets and liabilities of Serv Trust is revealing.

Even more revealing, however, is that Mr. Myers has again taken this approach with his second bankruptcy proceeding. Indeed, on March 13, 2019, Mr. Myers filed a new bankruptcy in the United States Bankruptcy Court for the District of Delaware, while the Myers Bankruptcy was still pending in the Maryland Bankruptcy Court. *See In re Myers,* Case No. 19-10392-BLS (Bankr. D. Del. 2019) (the "Myers Delaware Bankruptcy").

The Myers Delaware Bankruptcy was promptly dismissed on March 28, 2019. *See* Order Dismissing Myers Delaware Bankruptcy, attached hereto as Exhibit L. Yet Mr. Myers sought reconsideration of that dismissal on the eve of his deposition being taken, in his capacity as a trustee of Serv Trust, in this case. *See In re Myers,* Case No. 19-10392-BLS (Bankr. D. Del. 2019), at DE #28.

The United States Bankruptcy Court for the District of Delaware would ultimately deny Mr. Myers' motion for reconsideration, indicating, *inter alia,* "Mr. Myers' case here is an abuse of process," and noting that he created a Delaware entity "in a transparent ploy to manufacture venue." *See* Order Denying Motion for Reconsideration, attached hereto as Exhibit M. In denying Mr. Myers' request for a stay pending appeal, on the same date, the court observed, *inter alia,* "His case is an abusive filing." *See* Order Denying Stay Pending Appeal, attached hereto as Exhibit N.

8

Yet after the Myers Delaware Bankruptcy was filed (the case ultimately deemed an "abusive filing"), while his reconsideration motion was pending, Mr. Myers was deposed herein in his official capacity as trustee of Serv Trust. Since Serv Trust was not a debtor in the Myers Delaware Bankruptcy, and its assets and liabilities accordingly not supposedly implicated by that sham proceeding, this should have been a straight forward deposition. It was not.

At deposition, Mr. Myers – testifying as the corporate designee of Serv Trust – repeatedly refused to answer questions about Serv Trust's affairs, insisting such to be prohibited by his personal automatic stay (an automatic stay that had been extinguished when the Myers Delaware Bankruptcy was dismissed weeks prior, nonetheless). At one point, he refused to answer questions from counsel for his own Maryland bankruptcy trustee about Serv Trust and its interplay with the Myers Bankruptcy (which was not even the bankruptcy for which he maintained the automatic stay to be applicable):

> Q. Was Serv Trust aware that Gregory Myers had filed a bankruptcy case in the State of Maryland?
> A. I'm going to, I'm going to -- I'm going to refuse to answer the questions based on the automatic stay under 11 U.S.C. 326. It's my position that stay is in place and I'm not going to answer these questions.
> Q. I'm asking questions of the Serv Trust designee. Has Serv Trust filed a bankruptcy to your knowledge?
> A. I understand. But you are implicating me, individually, so I'm not going to answer his questions.

Serv Trust Depo., Ex. J, at 240:6-16.

Later in the same deposition, Mr. Myers would again protest that questions concerning Serv Trust's financial activities were off limits since they implicate him personally:

> Q. Did Serv Trust file a proof of claim in Greg Myers' bankruptcy case in Maryland?
> A. Okay. And I am going to -- I'm going to restate my objection to these questions, because they implicate me individually. And so I'm not going to answer any further questions that have any implication whatsoever to me individually. And if Mr. Mastro wants to go to Delaware and seek an order from the Delaware bankruptcy

9

court, he's welcome to do that. Otherwise, you know, he can file a motion to compel in the Montgomery County Circuit Court.

Serv Trust Depo, Ex. J, at 241:16-242:5.

Earlier in the deposition, Mr. Myers – testifying for Serv Trust – unilaterally deemed the provision of services for Serv Trust to so intimately involve his financial affairs as to implicate the automatic stay:

> Q. Has any individual or any entity performed services for Serv Trust for free?
> MR. SOUZA: That is -- objection.
> A. This is a fishing expedition on this --
> MR. SOUZA: Asked and answered.
> A. -- entire alter ego thing. And so if you want to ask questions concerning your claims and your lawsuit, then I am here to answer as a corporate representative, I can do that. Otherwise I'm going to stop under the automatic stay of 11 U.S.C. 362, which I will file a complaint that you're in violation of.

Serv Trust Depo, Ex. J, at 95:17-96:6.

Indeed, Mr. Myers – who had served as the manager of Goldsboro for a significant period of time relevant to this case – even refused to answer questions about such service, because such would implicate his personal affairs and, by extension, the automatic stay:

> Q. How much were you paid to be a manager of Goldsboro?
> A. Okay. Well your questions are in violation of 11 U.S.C. 362 and I'm not going to answer questions in my individual capacity.

Serv Trust Depo, Ex. J, at 144:6-10.

While other anecdotes abound from the stunningly schizophrenic deposition of Serv Trust, these excerpts more than amply demonstrate Mr. Myers' wholesale inability to separate his personal affairs and financial obligations from those of Serv Trust.

**V.      Standard**

Familiarly, the Maryland Rules provide for the entry of summary judgment in matters where there is no genuine issue of material fact to be determined at trial:

> Any party may file a written motion for summary judgment on all or part of an

> action on the ground that there is no genuine dispute as to any material fact and
> that the party is entitled to judgment as a matter of law. The motion shall be
> supported by affidavit if it is (1) filed before the day on which the adverse party's
> initial pleading or motion is filed or (2) based on facts not contained in the
> record…

Md. Rule 2-501(a). The same provision goes on to observe, *inter alia*, "The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(f).

As observed by this state's highest court, to overcome a motion for summary judgment, a non-moving party must demonstrate the existence of a genuine dispute as to a material fact through the use of admissible evidence:

> [I]n order to defeat a motion for summary judgment, the opposing party must
> show that there is a genuine dispute as to a material fact by proffering facts which
> would be admissible in evidence. Consequently, mere general allegations which
> do not show facts in detail and with precision are insufficient to prevent summary
> judgment. Moreover, a person opposing summary judgment cannot merely allude
> to the existence of a document and thereby hope to raise the specter of dispute
> over a material fact which would defeat a motion for summary judgment.

*Beatty v. Trailmaster Products, Inc.*, 330 Md. 726, 737–38 (1993) (citing *Hoffman Chev. v. Wash. Co. Nat'l Sav.*, 297 Md. 691, 711-15 (1983); *Shaffer v. Lohr*, 264 Md. 397, 404 (1972); *Broadfording Ch. v. Western Md. Ry.*, 262 Md. 84, 89 (1971); *Lynx, Inc. v. Ordnance Products*, 273 Md. 1, 7-8 (1974); *Brown v. Suburban Cadillac, Inc.*, 260 Md. 251, 256-57 (1971)).

## VI.    Argument: The Settlement Merits Judicial Approval

The record herein makes clear Serv Trust is Mr. Myers' alter ego and should be regarded as such. This is the lone finding sought herein, as this finding renders the rest of the instant case a nullity in its present posture, since the assets and liabilities of Serv Trust – including its claims and defenses in this litigation – thus become those of Mr. Myers' bankruptcy trustee.

11

Under Maryland law, an alter ego is found, and a veil is pierced, where "fundamental equity and fairness" necessitate such. *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md. App. 294, 307 (1999). Specifically:

> The factors used in analyzing whether a paramount equity should be enforced include, inter alia, "whether the corporation was grossly undercapitalized, ... the dominant stockholder's siphoning of corporate funds, ... the absence of corporate records, and the corporation's status as a facade for the stockholders' operations."

*Residential Warranty Corp.*, 126 Md. App. at 307 (quoting *Travel Committee, Inc. v. Pan American World Airways, Inc.*, 91 Md. App. 123, 59 (quoting *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 686-687 (4th Cir.1976)).

Here, there is no question but that Serv Trust is "grossly undercapitalized." Since entering into the Goldsboro venture with the King Parties, Serv Trust's only activities have been borrowing monies from Goldsboro and then giving them to Mr. Myers and/or his wife. Serv Trust owes more than Six Hundred Thousand Dollars and No Cents ($600,000.00) without interest, and is likely even further in debt based on Mr. Myers' testimony herein that the entity has also borrowed funds from companies controlled by Daniel Ring, its other trustee.

Moreover, Mr. Myers has certainly siphoned the funds of Serv Trust. As set forth *supra*, every dollar loaned to Serv Trust by Goldsboro went to either Mr. Myers or Mr. Myers' wife. Some monies did not even pass through Serv Trust but, instead, went directly to Mr. Myers. And the ultimate use of these funds is clearly personal in nature, with Mr. Myers having Serv Trust take out loans to pay legal bills for his personal bankruptcy, to pay legal bills for appeals in which he (or he and his wife) are parties, and to manage his day-to-day affairs.

The absence of corporate records is also striking. Serv Trust has not produced any corporate financial records herein, despite having been served requests to do so. (Nor has Serv Trust sought a protective order or objected to such requests; it simply did not hand over documents.) *See*

12

Document Requests to Serv Trust, attached hereto as Exhibit O. And this is not a novel occurrence; as discussed above, Mr. Myers failed to hand over the same records as part of his bankruptcy, leading to the ultimate denial of his discharge.

This leaves only the question of Serv Trust being a "façade" for Mr. Myers' operations. And given that Serv Trust has been solely involved in a real estate project located by Mr. Myers and managed by Mr. Myers, borrowing money from Goldsboro for the benefit of Mr. Myers, handing those monies directly over to Mr. Myers and his wife, and seemingly not maintaining any financial records, it is clear Serv Trust is, indeed, a façade for his operations.

In short, Mr. Myers has used Serv Trust as a façade to keep monies away from his creditors, to keep a real estate project beyond the reach of his creditors, to create a lien aimed at frustrating the collection efforts of his creditors, and to maintain a vehicle through which he could self-deal away from the purview of the Maryland Bankruptcy Court. This is the epitome of an alter ego construct, and a case study in the sort of scenario that calls for a veil to be pierced.

## VII.    Conclusion

WHEREFORE, the King Parties respectfully pray this Honorable Court find Serv Trust to be the alter ego of Mr. Myers, statistically close this proceeding pending transfer to the Maryland Bankruptcy Court,[2] and afford such other and further relief as may be just and proper.

**[SIGNATURE ON FOLLOWING PAGE]**

---

[2] Once it is established Serv Trust is Mr. Myers' alter ego, this litigation would then be administered as an asset of Mr. Myers' bankruptcy estate, as a core proceeding under Section 157 of Title 28 of the United States Code, and effectively "removed" from this Honorable Court.

Respectfully submitted,

THE VERSTANDIG LAW FIRM, LLC,

Maurice B. VerStandig, Esq.
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: 301-444-4600
Facsimile: 301-576-6885
E-mail: mac@mbvesq.com
*Counsel for the Plaintiffs*

## REQUEST FOR HEARING

Pursuant to, and in accord with, Maryland Rule 2-311(f), the Plaintiffs request a hearing

on their Motion for Summary Judgment.

Maurice B. VerStandig, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of May, 2019, I caused a true and correct copy of

the foregoing paper to be served upon the following persons via First Class Mail, postage

prepaid:

Dominic J. Souza, Esq.
Souza LLC
2543 Housley Road
Annapolis, Maryland 21401
*Counsel for Serv Trust*

Frances Wilburn, Esq.
Offit Kurman, P.A.
4800 Montgomery Lane
Suite 900

14

Bethesda, Maryland 20814
*Counsel for 6789 Goldsboro LLC*

Gregory Myers
700 Gulf Shore Blvd. N
Naples, Florida 34102
*Pro Se Defendant*

Frank Mastro, Esq.
Schlossberg Mastro & Scanlan
P.O. Box 2067
Hagerstown, MD 21742
*Counsel for the Chapter 7 Trustee of the
Bankruptcy Estate of Gregory B. Myers*

Maurice B. VerStandig, Esq.

# Exhibit F

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| | | |
|---|---|---|
| BRIAN KING, *et al.* | : | |
| Plaintiffs/Counter Defendants, | : | |
| v. | : | **Case No. 436977V** |
| | : | **(Lead Case)** |
| SERV TRUST, *et al.* | : | |
| Defendant/Counter Plaintiff. | : | |

| | | |
|---|---|---|
| 6789 GOLDSBORO, LLC | : | |
| Plaintiff, | : | |
| v. | : | **Case No. 451611-V** |
| | : | **(Consolidated Case)** |
| SERV TRUST, *et al.* | : | |
| Defendants. | : | |

### OPPOSITION TO DEFENDANT'S MOTION FOR
### PARTIAL SUMMARY JUDGMENT AND REQUEST FOR HEARING

THE VERSTANDIG LAW FIRM, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: 301-444-4600
Facsimile: 301-576-6885
Electronic Mail: mac@mbvesq.com

Come now Brian King ("Mr. King"), Cristina King, and Mr. King in his capacity as trustee of the Cristina and Brian King Children's Trust (collectively, the "Plaintiffs" or "King Parties"), by and through undersigned counsel, pursuant to Maryland Rule 2-501(b), and in response to the Motion for Partial Summary Judgment (the "Motion") filed by Serv Trust state as follows:

## I.     Introduction

This case concerns the repeated bad acts of Gregory Myers ("Mr. Myers") and Serv Trust, a trust that operates as Mr. Myers' alter ego. After strategically evading discovery in a repetitive and concerted manner, Serv Trust now seeks summary judgment. As extrapolated upon below, the Motion merits denial for myriad procedural and substantive reasons.

First, the Motion should be denied on account of Serv Trust's refusal to engage discovery on multiple occasions. Serv Trust has ignored – wholly – an entire set of document requests, one of its trustees has failed to appear for deposition on three separate occasions, and its other trustee failed to appear for deposition in his personal capacity before appearing in a corporate capacity and refusing to answer several questions. The Maryland Rules state discovery failures are grounds alone to deny summary judgment, and this is a textbook example of where such is appropriate.

Second, the Motion should be denied because Serv Trust lacks standing to prosecute or defend this case. Serv Trust is, quite manifestly, the alter ego of Mr. Myers. Mr. Myers, in turn, is a debtor in bankruptcy. As such, the assets of Mr. Myers – including the whole of Serv Trust's assets – belong to his bankruptcy estate, as administered by his court-appointed trustee.

Third, the Motion should be denied on its merits. Serv Trust ignores the plain language of an operating agreement and endeavors use its own breach of that agreement to avoid the processes set forth therein. Further, Serv Trust endeavors to gain summary judgment through a memorandum

of understanding (the "MOU") which is fraudulent in nature. The very authenticity of the MOU is the subject of a genuine dispute of material fact.

The Motion also seeks relief for which Serv Trust has not sought derivative standing, seeks relief in contravention of the economic loss rule and the business judgment rule, ignores wholly that reasonableness is per se a question of fact, and endeavors to rewrite the elements of multiple causes of action so as to avoid the necessity of damages being present for a claim to be maintained.

For these reasons, and as discussed in greater detail below, the Motion should be denied.

## II.    Statement of Facts

Mr. Myers discovered a parcel of property in Bethesda, Maryland, which he thought suitable for development. *See* Serv Trust Deposition ("Depo"), Ex. 1, at 130:11-131:7. On the recommendation of an acquaintance, he approached Mr. King about financing the acquisition of the property. *See* King Depo, Ex. 2, at 16:6-25

At the time, Mr. Myers was heavily indebted to myriad creditors, and facing the clear prospect of filing bankruptcy. *See* Mr. Myers' Bankruptcy Schedules, Ex. 3. He thus asked the investment be put in the name of Serv Trust. *See* King Aff., Ex. 4, at ¶ 4.

Mr. Myers – using the façade of Serv Trust – negotiated an operating agreement (the "Operating Agreement," defined to include its subsequent amendments) for the entity he formed with the King Parties ("Goldsboro"). *See* Operating Agreement, Ex. 5. The Operating Agreement provides for the King Parties to put up almost all the money to acquire the property and fund its development, and gives Mr. Myers three years to make the project profitable or his sweat equity interest (in the name of Serv Trust) may be redeemed by the King Parties. *Id.* at §§ 3.2, 3.10, 7.7.

As the project continued, Mr. Myers' personal financial condition became more desperate, leading ultimately to his filing bankruptcy on November 18, 2015. *See* Bankruptcy Petition, Ex.

2

6. Since Mr. Myers filed bankruptcy under Chapter 11, his ongoing earnings became part of his bankruptcy estate. *See* 11 U.S.C. § 1115.

Needing money, but wishing to keep it beyond the reach of his creditors, Mr. Myers would repeatedly ask Mr. King to bestow Goldsboro with monies to be loaned out. *See* King Aff., Ex. 4, at ¶¶ 3, 7-10. And while all funds were putatively loaned to Serv Trust, Mr. Myers never shied away from using the first person, or identifying his own personal needs, in specifying why he needed the subject loans. *See, e.g.,* June 9, 2016 e-mail, Ex. 7 ("I only want to ask you for what I need to survive right now, which is $40k (which includes $15k to pay past tuition for Teddy so he can get his official transcript from Furman to transfer to Trinitiy; [sic] **$5k to keep my Chapter 11 alive**, $2,270 for monthly health insurance premiums; $3,500 in past due utilities; **$10k in legal fees for appeals**; food, gas, etc.)") (emphasis added); July 14, 2016 e-mail, Ex. 8 ("…I have two checks that will be presented today totaling just under $7k **to an attorney – who, if my checks bounce, will withdraw from my appeal**…") (emphasis added).

Later, Mr. Myers wrote to Mr. King, again demanding monies be loaned to Serv Trust for Mr. Myers' personal utilization, and threatening the Goldsboro project if the loan is not made:

> I received a revised set of papers yesterday from Danielle in which you now apparently will make no further advances to Serv Trust. I instructed David Miller to not review them.
>
> Your decision hurts me, and could possibly put the project in jeopardy. **If I cannot pay my ongoing expenses, then I suspect this will not end well.**

*See* August 10, 2016 e-mail, Ex. 9 (emphasis added).

On at least one occasion, Mr. Myers asked the monies being loaned to him not even pass through Serv Trust and, instead, be given to him directly; Goldsboro complied. *See* King Aff., Ex. 4, at ¶ 9. This was not unusual or strange, as it was always understood that the monies being taken out of Goldsboro were for Mr. Myers' personal use. *See* King Aff., Ex. 4, at ¶ 10.

3

Knowing Mr. Myers needed money, in September 2016 the King Parties offered to buy Mr. Myers out of the Goldsboro project in exchange for Two Million Dollars ($2,000,000.00) less outstanding loan obligations of Mr. Myers/Serv Trust to Goldsboro. *See* MOU, Ex. 10. Mr. King, knowing key developmental decisions to be looming, and needing certainty as to whether he was proceeding with Mr. Myers or not, insisted in the MOU that it be accepted by September 12, 2016 and, if accepted, that closing promptly occur not later than October 7, 2017. *Id.*

Mr. Myers did not accept the MOU by September 12, 2016. *See* King/Lynch Text Messages, Ex. 11; King Aff., Ex. 4, at ¶¶ 11-12. No closing papers were drawn up. *See* King Aff., Ex. 4, at ¶ 13. Mr. Myers carried on business as usual after the MOU was due to be signed, even asking Mr. King to increase the buyout offer. *See* King/Lynch Text Messages, Ex. 11; King Aff., Ex. 4, at ¶¶ 12, 14; Myers E-mails, Ex. 20.

Several months later, Goldsboro learned of adverse news from local government officials concerning the allowable scope of the project. *See* King Aff., Ex. 4, at ¶ 15; Serv Trust Depo, Ex. 1, at 224:19-225:4. Shortly thereafter, for the first time, Mr. Myers e-mailed Mr. King an executed copy of the MOU, in January 2017. *See* January 10, 2017 E-mail, Ex. 12. The dates in the MOU had long since come and gone, but Mr. Myers was now pretending the MOU had been timely executed and submitted. *See* King Aff., Ex. 4, at ¶ 14.

The King Parties then terminated Mr. Myers as manager of Goldsboro and Mr. King took over. *See* King Aff., Ex. 4, at ¶ 16. As manager of Goldsboro, Mr. King has exercised his best judgment to guide the entity. *See* King Depo, Ex.2, at 88:24-90:4.

Following Mr. Myers' attempted manipulation of the MOU, the King Parties had the property appraised. Realizing it appraised for les than fifty percent (50%) of the nearly Two Million Eight Hundred Thousand Dollars ($2,800,000.00) the King Parties had sunk into the

4

project (much of which was loaned to Mr. Myers/Serv Trust) the King Parties elected to invoke the Operating Agreement mechanism for redeeming Serv Trust's interest. *See* Notice of Election, Ex. 13; Appraisal Report, Ex. 14; Contribution Chart, Ex. 4-1; King Aff., Ex. 4, at ¶¶ 17-18.

Mr. Myers acknowledged receipt of the King Parties' notice of election but, in lieu of appointing his own appraiser to value the property, opted to threaten to sue the King Parties' lawyer, and, for the first time, made reference to endeavoring to enforce the fraudulent MOU. *See* Letter of Gregory Myers, Ex. 15.

This suit was then filed. *See* Complaint, DE #1. During the course of this litigation, Mr. Myers filed a suggestion of bankruptcy based on his own bankruptcy in Maryland, at a time when only Serv Trust was a defendant. *See* DE #13. Mr. Myers has also filed a second bankruptcy, this time in Delaware, which was judicially deemed "an abuse of process" and "an abusive filing". *See* Order Denying Motion for Reconsideration, Ex. 16; Order Denying Stay Pending Appeal, Ex. 17.

The United States Bankruptcy Court for the District of Maryland has revoked Mr. Myers' discharge due to his commission of multiple acts of fraud, some involving his relationship with Goldsboro. *See* Order Denying Discharge, Ex. 18 (noting Mr. Myers' "cavalier attitude toward his schedules and a reckless disregard for the truth," and his "failure to list Goldsboro in his initial schedules and his failure to disclose his personal guaranty of Goldsboro's advances to Serv Trust at the 341 Meeting was a significant factor in the Court's decision to convert Myers' case.").

### III.   Argument: The Motion Merits Denial Because Serv Trust has Refused to Engage Discovery in Good Faith

As set forth in the King Parties' Motion for Discovery Sanctions (DE #141), Mr. Myers/Serv Trust have repeatedly failed to engage in discovery in this case. They have ignored an entire set of requests for production of documents, one of Serv Trust's trustees has failed to appear for deposition on three separate occasions, and the other trustee failed to appear for deposition in

his personal capacity and then refused to answer myriad questions when deposed in his official capacity. *See* Motion for Discovery Sanctions, Ex. 19. These discovery failures seem aimed at frustrating the Plaintiffs' ability to garner summary judgment and respond to Serv Trust's Motion.

The Maryland Rules plainly contemplate a situation such as this, and specifically provide for the denial of summary judgment where a party has evaded discovery:

> If the court is satisfied from the affidavit of a party opposing a motion for summary judgment that the facts essential to justify the opposition cannot be set forth for reasons stated in the affidavit, the court may deny the motion or may order a continuance to permit affidavits to be obtained or discovery to be conducted or may enter any other order that justice requires.

Md. Rule 2-501(d).

Serv Trust's myriad discovery failures have prohibited the Plaintiffs from learning, *inter alia*, (i) what theory of damages Serv Trust is pursuing for its tort-centric claims against the King Parties; (ii) how Serv Trust believes a delay in developing the property has caused any economic harm; (iii) what steps Serv Trust maintains Mr. King would have to take to constitute subjective reasonableness; (iv) why Serv Trust never followed up to see if closing documents were drafted pursuant to the MOU; (v) what steps, if any, Serv Trust took to obtain closing documents for the MOU; (vi) when Serv Trust endeavored – if ever – to enforce the MOU, before this suit; (vii) why Mr. Myers did not disclose the MOU in his personal bankruptcy since it provided for the extinguishment of his personal debt to Goldsboro; (viii) whether Serv Trust has any records of carrying on any economic activity other than giving money to Mr. Myers and his wife; (ix) what communications exist documenting Serv Trust's giving money to Mr. Myers and his wife while they were debtors in bankruptcy; (x) how Serv Trust classified payments to Mr. Myers and his wife for tax purposes; (xi) what steps Mr. Myers took as manager of Goldsboro which he believes Mr. King to have then abandoned; (xii) why Serv Trust affirmatively elected to not appoint its own appraiser for the Goldsboro property when the redemption mechanism was triggered; (xiii) why

6

Serv Trust believes alleged inaction with development of the Goldsboro property was aimed at triggering the redemption mechanism; (xiv) why Mr. Myers filed a personal suggestion of bankruptcy in this case more than a year before he was made a party hereto, when only Serv Trust was a defendant; (xv) whether or not Mr. Ring's signature on the MOU is genuine; (xvi) whether or not Mr. Ring signed the MOU, if at all, on the date indicated thereupon; (xvii) whether or not Mr. Ring has knowledge of the tendering of the MOU to any of the Plaintiffs; (xviii) why Serv Trust has not sought derivative standing to pursue its tort claims; (xix) why Serv Trust believes it can pursue its tort claims without derivative standing; and (xx) all manner of follow-up questions that would be born of the answers to these key elemental inquiries. *See* King Aff., Ex. 4, at ¶ 19.

### IV.    Argument: Serv Trust Lacks Standing to Bring or Defend This Case

As set forth more fully in the King Parties' Motion for Partial Summary Judgment (DE #136), the record herein reveals Serv Trust is – and at all times relevant has been – the alter ego of Mr. Myers. Under governing law, this renders Serv Trust's litigation claims an asset of Mr. Myers' bankruptcy estate and deprives Serv Trust of the legal standing to prosecute its counterclaim.

Specifically, Mr. Myers filed for bankruptcy on November 18, 2015, and later had his case converted from one under Chapter 11 to one under Chapter 7. *See* Order Denying Discharge, Ex. 18. Under federal law, Serv Trust's assets – given its status as the alter ego of Mr. Myers – belong not to Serv Trust or Mr. Myers but, rather, his bankruptcy estate. *See, e.g.,* 11 U.S.C. 541 (noting "all **legal or equitable interests** of the debtor in property" to be assets of the bankruptcy estate) (emphasis added). And it is the bankruptcy trustee, not Mr. Myers, who is directed to "collect and reduce to money the property of the estate for which such trustee serves…" 11 U.S.C. § 704.

So it is the trustee (Roger Schlossberg) who owns the litigation rights of Serv Trust. Mr. Myers/Serv Trust are accordingly without any legal interest in the claims raised in the Motion and, as such, lack standing to maintain or defend this suit.

7

The King Parties have moved for summary judgment on the alter ego issue, and Mr. Myers/Serv Trust have not. If the King Parties prevail on their motion, the whole of the case will fall to the trustee and be moved to bankruptcy court. But even if the King Parties do not prevail on their motion, summary judgment cannot be granted for Serv Trust, on *any* claim, until such a time as there is a trial on the merits of the alter ego issue which will dictate whether or not Serv Trust has standing to bring or defend the claims raised in this case (including those in its Motion).

V.    **Argument: Summary Judgment Should be Denied on the Plaintiffs' Claims**

   a.    **The King Parties Have Full Authority to Redeem Serv Trust's Membership Interest**

Mr. Myers/Serv Trust suggest, for the first time in their Motion, the King Parties lack authority to invoke the redemption mechanism under the Operating Agreement. *See* Motion at pp. 11-12. They argue that Mr. Myers/Serv Trust's interest in Goldsboro cannot be redeemed without the consent of Mr. Myers/Serv Trust. *Id.* This is not a good faith argument.

Core to this argument is the notion that Goldsboro as an entity must trigger the redemption mechanism. Yet this argument ignores, *en toto*, the plain language of the Operating Agreement:

> [T]he Class A Members shall have the **unilateral right** and authority (**without the consent of the Class B Member**) to cause the Company to redeem the Class B Member's Membership Rights…

Operating Agreement, Ex. 5, at § 7.7 (emphasis added).

Arguing Mr. Myers/Serv Trust's consent as members of Goldsboro is required to do something that is specified in the Operating Agreement as the "unilateral right" of the King Parties, and which the Operating Agreement makes clear may be done "without the consent of the Class B Members" is a non-viable theory for summary judgment (or trial).

### b. The King Parties Have Followed the Operating Agreement's Redemption Procedure

The Motion suggests the King Parties cannot exercise the redemption mechanism in the Operating Agreement because their appraiser's report is dated just prior to the date on which he was formally designated. The Motion asserts an appraisal must be performed "within 15 days **after** demand is made." Motion at p. 8 (emphasis in original). This is counterfactual.

The Operating Agreement does *not* provide a time for the subject appraisal to be made and does *not* require it be made after an appraiser is designated. Rather, it states only an appraiser must be named within 15 days of a redemption election. *See* Operating Agreement, Ex. 5, at § 7.5.1. Nowhere does the Operating Agreement say or imply the appraisal must come after appointment.

This is not surprising. Of course the King Parties are not going to trigger the process and go through the procedure by naming an appraiser if s/he is then going to come back with an appraisal that is lower than the requisite threshold. To suggest the Operating Agreement intends to impose such a regime is nonsensical, and nothing in the Operating Agreement supports such.

### c. Serv Trust Cannot Use its Own Failure to Designate an Appraiser to its Benefit

The Motion next contends Mr. Myers/Serv Trust have the right to unilaterally frustrate the redemption mechanism in the Operating Agreement by simply refusing to appoint an appraiser. Motion at pp. 6-8. The Motion theorizes a process intended to take a mere fifteen (15) days may be dragged out over the course of years, by Mr. Myers/Serv Trust, should they simply not appoint an appraiser. *Id.* This argument ignores the nature of the declaratory judgment sought and also ignores the "without the consent of the Class B Member" clause of the Operating Agreement referenced above, which renders this Argument an incoherent reading of the Operating Agreement.

The King Parties seek, *inter alia*, a declaration "Serv Trust … waived its right to appoint an alternative appraiser under the Operating Agreement by not doing so on or before September

9

11, 2017." *See* First Amended Complaint at p. 12. Since Mr. Myers/Serv Trust clearly knew of the redemption mechanism being triggered, but elected to respond by threatening to sue the King Parties' counsel, the King Parties seek a declaration Mr. Myers/Serv Trust waived their rights.

Under Maryland law, "Whether or not there has been a waiver of such a right under a contract is generally a question of fact." *BarGale Indus., Inc. v. Robert Realty Co., Inc.*, 275 Md. 638, 644 (1975) (citing *Fidelity and Casualty Co. of N. Y. v. Dulany*, 123 Md. 486, 496 (1914)).

Moreover, Mr. Myers/Serv Trust's theory of an ability to unilaterally frustrate the redemption mechanism by not appointing an appraiser is directly undermined by the Operating Agreement's plain language providing the "Class A Members shall have the **unilateral right** and authority **(without the consent of the Class B Member)** to cause the Company to redeem the Class B Member's Membership Rights." Operating Agreement, Ex. 5, at § 7.7 (emphasis added).

One of the purposes of the declaratory judgment is to establish a waiver – which is not addressed in the Motion and which is "generally a question of fact." There would be no need for this case if Mr. Myers/Serv Trust had appointed an appraiser. But Mr. Myers/Serv Trust elected to refuse to appoint an appraiser and, thus, the King Parties – believing a redemption to have occurred, consistent with their "unilateral right," but wishing to have some judicial assurance of such – brought their declaratory judgment suit.

### d. The MOU is Fraudulent and Creates a Genuine Dispute of Material Fact

The Motion next contends the MOU constitutes a novation and, as such, moots the redemption procedure. *See* Motion at pp. 9-10. In doing so, the Motion ignores the validity, *vel non*, of the MOU is a material fact very much the subject of a genuine dispute.

The MOU plainly states, *inter alia*, "This Agreement must be executed by September 12, 2016 **or this Agreement shall be null and void.** The Closing must occur by October 7, 2016." *See* MOU, Ex. 10 (emphasis added).

10

As noted *supra*, there is no question but that a closing did not occur by October 7, 2016. Nor is there any question but that closing documents were never drafted. The record is devoid of any communications wherein Mr. Myers/Serv Trust inquire about the status of the closing documents – ever. There are no e-mails or other verifiable communications evidencing acceptance of the MOU prior to January 2017 (four months too late).

To the contrary, there is date-stamped evidence Mr. Myers sought to negotiate a different purchase price after the MOU became null and void due to its non-acceptance. There is also evidence of Mr. Myers carrying on business as normal after September 12, 2016 (and October 7, 2016). *See* E-mails from Myers, Ex. 20.

As such, whether or not the MOU was timely signed and tendered, and whether or not it is a valid agreement, are matters of disputed fact. There is extensive evidence the MOU was fraudulently executed and/or tendered long after it came due. Accordingly, summary judgment cannot be granted on any theory related to the MOU.[1]

## VI.    Argument: Summary Judgment Should be Denied as to Counts V and VI of the Counterclaim

Mr. Myers/Serv Trust next argue for summary judgment on counts V and VI of their counterclaim for constructive fraud and negligence related to Mr. King's management of Goldsboro. The Motion theorizes Mr. King has not adequately developed the entity's property since taking over as manager and, as such, has committed constructive fraud and/or been negligent. Summary judgment on these two counts should be denied for several reasons.

---

[1] Mr. Myers/Serv Trust argue, separately in their brief, for summary judgment on their claim for breach of contract, based on the MOU. *See* Motion at p. 12. This necessarily fails for the same exact reasons. Stated most simply, there cannot be a breach of contract in the absence of a valid contract. *See, e.g., In re Council of Unit Owners of 100 Harborview Drive Condo.*, 584 B.R. 639, 655 (Bankr. D. Md. 2018) (noting the requisite "existence of a contractual obligation" for a breach of contract to occur).

11

### a. The Relief Sought Violates the Economic Loss Doctrine

As a threshold matter, even if Mr. King did not adequately develop the property (which is at-best a disputed question of material fact), Mr. Myers/Serv Trust cannot utilize tort relief to recover damages. This is a core abrogation of the economic loss doctrine.

As explained by the Court of Special Appeals, one cannot recover in tort for damages that arise under a contractual relationship:

> "The economic loss doctrine, which developed in product liability cases, prohibits a plaintiff from recovering tort damages for what in fact is a breach of contract." The doctrine "serves as a boundary between contract law, the purpose of which is to enforce the expectations of the parties to an agreement, and tort law, the purpose of which is to protect people and property from foreseeable risks of harm by imposing upon others a duty of reasonable care."

*Landaverde v. Navarro*, 238 Md. App. 224, 254 n. 6 (2018) (quoting *Cash & Carry Am., Inc. v. Roof Sols., Inc*, 223 Md. App. 451, 466 (2015)). *See also, Cash & Carry Am., Inc.*, 223 Md. App at 466 ("tort law is not intended to compensate parties for monetary los[s]es suffered as a result of duties which are owed to them simply as a result of a contract") (quoting *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 294 (Ill. App. 1999)).

Here, the Motion premises these counts on Section 6.1.1 of the Operating Agreement, which requires, pertinently, "The Manager shall use commercially reasonable good faith efforts to, without limitation, obtain the Entitlements, ensure that the Property is properly maintained, and otherwise act in the best interests of the Company." *See* Operating Agreement, Ex. 5, at § 6.1.1. Yet the Operating Agreement is, in every sense of the term, a contract, and any breach thereof is, by definition, a breach of contract. Thus, under *Cash & Carry Am., Inc.* and its progeny, Mr. Myers/Serv Trust are limited to seeking damages for breach of contract (which they have not endeavored to do)[2] and barred from seeking to recover through tort theories.

---

[2] Mr. Myers/Serv Trust's claim for breach of contract, discussed *infra*, n.1, is topically unrelated.

12

### b. The Relief Sought is Barred by the Business Judgment Rule

There is no question but that Mr. King is the manager of Goldsboro and thus carrying on in his capacity as such when developing the entity's property and managing its affairs. As such, he is entitled to protection from suits such as this by the business judgment rule.

As the Court of Special Appeals has explained, "[i]f the corporate directors' conduct is authorized, a showing must be made of fraud, self-dealing or unconscionable conduct to justify judicial review." *Danielewicz v. Arnold*, 137 Md. App. 601, 638 (2001) (quoting *Wittman v. Crooke*, 120 Md. App. 369, 376 (1998)).

There is no argument *sub judice* Mr. King's actions have not been authorized, nor is there any argument he has committed fraud,[3] self-dealt, or acted unconscionably. Accordingly, the business judgment rule bars recovery herein.

### c. Serv Trust Lacks Standing to Sue Mr. King for His Management

In their counts for constructive fraud and negligence, Mr. Myers/Serv Trust also miss, *en toto*, that they lack standing to pursue such claims, which even if valid would be the sole property of Goldsboro.

"[A] stockholder cannot maintain an action at law against an officer or director of the corporation to recover damages for fraud, embezzlement, or other breach of trust which depreciated the capital stock or rendered it valueless." *Danielewicz v. Arnold*, 137 Md. App. 601, 617 (2001).[4] *See also, Oliveira v. Sugarman*, 451 Md. 208, 240 (2017) ("a harm suffered by both the shareholders and the corporation alike can only support a shareholder derivative claim").

---

[3] While Mr. Myers/Serv Trust sue for "constructive fraud," the Motion takes great lengths to note this is different than actual fraud. Motion at p. 13.

[4] The Maryland Limited Liability Act provides for derivative actions "to the same extent that a stockholder may bring an action for a derivative suit under the corporation law." Corps. & Ass'ns § 4A-801.

13

Here, if Mr. King's actions impaired the value of Goldsboro (which they have not), any claim for damages would be the sole asset of Goldsboro. Mr. Myers/Serv Trust have not sought derivative standing, and Goldsboro is represented by separate, independent counsel herein.

### d. Serv Trust Has Not Exhibited Any Evidence of Claimed Damages and Such Damages are Elemental

Seemingly aware that there is no actual evidence of any damages to Goldsboro based on Mr. King's management of the entity, Mr. Myers/Serv Trust endeavor to end-run this issue by seeking summary judgment "as to liability only." Motion at pp. 12, 14. What Mr. Myers/Serv Trust miss is that damages are elemental of both claims; there can be no liability without damages.

In order for one to be liable for constructive fraud or negligence, there must be proof of damages. *See, e.g., Dynacorp Ltd. v. Aramtel Ltd.*, 208 Md. App. 403, 491 n. 45 (2012) ("Constructive fraud, a type of fraud, requires proof of damages.") (citing *Crawford v. Mindel*, 57 Md. App. 111, 120 (1984)); *Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 76 (1994) (observing negligence requires "the plaintiff suffered actual injury or loss").

Without damages, there can be no constructive fraud[5] and there can be no negligence. Thus one cannot be liable for these without a showing of damages, yet that is exactly what Mr. Myers/Serv Trust ask this Honorable Court to find. This is not a situation where a contract has been breached, damage has been proven, and a jury simply needs to fix the precise sum of damages; this is, rather, a situation where Mr. Myers/Serv Trust are endeavoring to strip the damage element, wholesale, from these two causes of action.

---

[5] Constructive fraud also requires a "tendency to deceive others, to violate public or private confidence, or to injure public interests." *Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 236 n. 12 (1995) (quoting *Shulton, Inc. v. Rubin*, 239 Md. 669, 686 (1965)). The facts and record *sub judice* do not indicate or evidence any deception, violation of confidence, or injury to the public interests. This constitutes yet another reason summary judgment should be denied on the claim for constructive fraud. The facts alleged herein do not come anywhere near the threshold of constructive fraud, and the claim appears to serve a solely vexatious purpose.

14

e.    **Whether or Not Mr. King's Efforts are Reasonable is Per Se a Question of Fact**

Even if, *arguendo*, the claims for constructive fraud and negligence were otherwise viable, summary judgment would still be improper since the reasonableness, *vel non*, of Mr. King's actions is inherently a question of fact.

The gravamen of Mr. Myers/Serv Trust's claims is Mr. King has not expended reasonable efforts to obtain government building permits for the Goldsboro property. Yet the Court of Appeals has made clear – in a case involving efforts to obtain government permits – reasonableness is a question of fact:

> That principle is merely another way of saying that, when performance of a contract is conditioned, expressly or by force of law, on the obtaining of some governmental permit or approval, the party required to obtain the permit or approval has an implied obligation to make a reasonable effort to do so. '[w]hat will constitute reasonable efforts under a contract expressly or impliedly calling for them is largely a question of fact in each particular case and entails a showing by the party required to make them of 'activity reasonably calculated to obtain the approval by action or expenditure not disproportionate in the circumstances.

*Informed Physician Services, Inc. v. Blue Cross & Blue Shield of Maryland, Inc.*, 350 Md. 308, 332 (1998) (quoting *Allview Acres v. Howard*, 229 Md. 238, 244 (1962)).

As noted *supra*, Mr. King has indicated his management of the Goldsboro property has been guided by consideration of the political composition of the local planning board, the evolving economic conditions of the neighborhood, the movement of interest rates, the number of housing units comprising current market inventory, and competing projects. *See* King Depo, Ex. 2, at 88:24-89:19. Mr. Myers/Serv Trust may not agree with this reasoning, but whether or not it is reasonable is, at irreducible minimum, the subject of a genuine dispute of material fact.

**VII.    Conclusion**

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court deny the Motion and afford such other and further relief as may be just and proper.

15

Respectfully submitted,

THE VERSTANDIG LAW FIRM, LLC,

Maurice B. VerStandig, Esq.
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: 301-444-4600
Facsimile: 301-576-6885
E-mail: mac@mbvesq.com
*Counsel for the King Parties*

## REQUEST FOR HEARING

Pursuant to, and in accord with, Maryland Rule 2-311(f), the Plaintiffs request a hearing

on the Motion for Partial Summary Judgment.

Maurice B. VerStandig, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of May, 2019, I caused a true and correct copy of the

foregoing paper to be served upon the following persons via First Class Mail, postage prepaid:

Dominic J. Souza, Esq.
Souza LLC
2543 Housley Road
Annapolis, Maryland 21401
*Counsel for Serv Trust*

Frances Wilburn, Esq.
Offit Kurman, P.A.
4800 Montgomery Lane, Suite 900
Bethesda, Maryland 20814
*Counsel for 6789 Goldsboro LLC*

16

Gregory Myers
700 Gulf Shore Blvd. N
Naples, Florida 34102
*Pro Se Defendant*

Frank Mastro, Esq.
Schlossberg Mastro & Scanlan
P.O. Box 2067
Hagerstown, MD 21742
*Counsel for the Chapter 7 Trustee of the*
*Bankruptcy Estate of Gregory B. Myers*

Maurice B. VerStandig, Esq.

17